JEFFER MANGELS BUTLER & MITCHELL LLP
BENJAMIN M. REZNIK (Bar No. 72364)
*breznik@jmbm.com*
MATTHEW D. HINKS (Bar No. 200750)
*mhinks@jmbm.com*
SEENA MAX SAMIMI (Bar No. 246335)
*ssamimi@jmbm.com*
JULIA CONSOLI-TIENSVOLD (Bar No. 324142)
*jctiensvold@jmbm.com*
1900 Avenue of the Stars, Seventh Floor
Los Angeles, California 90067-4308
Telephone:   (310) 203-8080
Facsimile:   (310) 203-0567

Attorneys for Plaintiff SULLIVAN EQUITY
PARTNERS, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| SULLIVAN EQUITY PARTNERS, LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF LOS ANGELES, a Charter City, and DOES 1 through 50, inclusive, <br><br> Defendant. | CASE NO. 2:16-cv-07148-CAS-AGR <br> The Hon. Christina A. Snyder <br><br> **FIRST AMENDED AND SUPPLEMENTAL  COMPLAINT FOR** <br><br> **(1) CIVIL RIGHTS VIOLATIONS, 42 U.S.C. § 1983, DENIAL OF PROCEDURAL AND SUBSTANTIVE DUE PROCESS** <br><br> **(2) CIVIL RIGHTS VIOLATIONS, 42 U.S.C. § 1983, INVERSE CONDEMNATION** <br><br> **(3) DECLARATORY RELIEF, 28 U.S.C. § 2201** <br><br> **DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1.     A fair trial in a fair tribunal is a basic requirement of due process. This is true of administrative adjudication as it is of courts. Not only is a biased decisionmaker constitutionally unacceptable, but our system of law endeavors to prevent even the probability of unfairness. The concept of fundamental fairness includes the right to an impartial decision maker. Fair procedure includes a right to a tribunal which meets the prevailing standards of impartiality. Plaintiff Sullivan Equity Partners, LLC, brings this civil rights lawsuit against the City of Los Angeles because it was denied basic due process when it was deprived of its property rights in the City' administrative processes and instead received pitchfork justice.

2.     This lawsuit stems initially from a mistake committed by a contractor clearing trees on Plaintiff's property. Plaintiff had received from the City a permit to remove 56 trees; the contractor removed 55, including 3 that he had misidentified. For that, the City initiated administrative proceedings culminating in the revocation of all of Plaintiff's vested building and grading permits issued for the development of two hillside properties. The City also imposed a penalty preventing the issuance of any new permits for five years.

3.     Prior to the deprivation of Plaintiff's property interests, due process mandated that the City provide Plaintiff with a fair trial before an unbiased judge. What Plaintiff got instead was a staged show trial before a kangaroo court convened by the City's Department of Public Works where the outcome was pre-ordained. The City officers that presided over the two quasi-judicial administrative hearings had led and conducted the investigation into the tree removal, had previously announced they were committed to invoking the drastic remedies supplied by the City's so-called "Scorched Earth Ordinance" before the hearings took place and were personally embroiled in the controversy and politically motivated and pressured to deprive Plaintiff of its property rights.

4.     The due process violations suffered by Plaintiff were egregious. Under

PRINTED ON
RECYCLED PAPER
67376176v1

any standard, the process employed by the City here was constitutionally infirm. Plaintiff is entitled to orders reinstating its vested permits and restoring its property rights and an award compensating it for the millions of dollars in damages it has suffered at the hands of the City.

## JURISDICTION AND VENUE

5.    This is a civil rights action arising under 42 U.S.C. § 1983 and 28 U.S.C. § 2201.  This Court has jurisdiction over this action under at least 28 U.S.C. § 1331 on the basis of the existence of a federal question.

6.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) since the actions complained of in this Complaint and the subject properties are sited in the Central District of California.

## THE PARTIES

7.    Plaintiff Sullivan Equity Partners, LLC was and is a limited liability company organized and duly existing under the laws of the State of Delaware and doing business in the City of Los Angeles, State of California.

8.    Defendant City of Los Angeles ("City") is a municipal entity with the capacity to sue and be sued. It is a Charter City under the laws of the State of California.   As used herein, the term "City" includes, but is not limited to, City employees, agents, officers, boards, commissions, departments, and their members, all equally charged with complying with duties under the City's Charter and Municipal Code, and with the laws of the State.

9.    Plaintiff is unaware of the true identities of the Defendants sued as DOES 1-50, and therefore sue them as fictionally-named Defendants.  At such time as Plaintiff identifies the true identities of DOES 1-50, Plaintiff will amend this Complaint to state those true identities.  Plaintiff is informed and believes, and on that basis alleges, that each fictionally-named DOE Defendant is responsible in whole or in part for the matters alleged by Plaintiff in this action, and that DOES 1-50 directed, participated in, approved, authorized, or ratified the matters alleged in this Complaint,

PRINTED ON

RECYCLED PAPER
67376176v1

and are directly liable or liable on grounds of agency, conspiracy, joint venture, partnership, aiding and abetting, and/or other grounds for the matters and causes of action alleged in this Complaint. At all times mentioned herein, each of the Defendants conspired with each other to commit the wrongful acts complained of herein. Although not all of the Defendants committed all of the acts of the conspiracy or were members of the conspiracy at all times during its existence, each Defendant knowingly performed one or more acts in direct furtherance of the objectives of the conspiracy. Therefore, each Defendant is liable for the acts of all the other conspirators.

## FACTS COMMON TO ALL CAUSES OF ACTION

### The Property and the Project

10.     Plaintiff Sullivan Equity Partners, LLC is a real estate development company established to construct two large single-family homes on two undeveloped lots (the "Project") located at 1834 N. Old Ranch Road and 1838 N. Old Ranch Road (collectively, the "Properties").

11.     The Properties are currently vacant and unimproved, though prior cut and fill grading of the Properties has been conducted. Properties neighboring the site to the south and west consist of low density, large estate single-family homes, as well as a higher density, high-end subdivision to the north and east.

12.     The Properties, collectively, are about 12 acres in size. They are located near the end of the Old Ranch Road in the Brentwood community of the City of Los Angeles, in an area known as Sullivan Canyon. Bucolic Sullivan Canyon, dotted with midcentury ranch homes designed by the famous architect Cliff May, is home to the some of the most affluent and politically-connected residents of the City.

13.     The Properties have been a project in the making for the last thirty or more years. Plaintiff is informed and believes and on that basis alleges that the Project site has been the scene of considerable acrimony and disagreement over the course of many years preceding Plaintiff's purchase of the Properties. The

PRINTED ON
RECYCLED PAPER
67376176v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

influential neighbors and community activists with ties to people in the highest levels of local, state and national government were and are strongly united and committed to ensuring that the Properties are never developed.

14. On July 25, 2014, building, grading and retaining wall permits were issued to Plaintiff for the construction of a single-family home at 1834 N. Old Ranch Road as follows: (i) Building permit for new two story single family dwelling over one level habitable basement, Permit No. 11010-20000-00321; (ii) Building permit for new detached four car garage, Permit No. 11010-2000-00325; (iii) Grading permit, Permit No. 11030-20000-00508; and, (iv) Building permit for 2 retaining walls, Permit No. 11020-2000-00239.  On the same date, permits to construct a second single-family home were also issued to Plaintiff for 1838 N. Old Ranch Road as follows: (i) Building permit for new two story single family dwelling over one level habitable basement, Permit No. 11010-20000-00322; (ii) Building permit for new detached four car garage, Permit No. 11010-20000-00328; (iii) Grading permit, Permit No. 11030-20000-00510; and, (iv) Building permit for 2 retaining walls, Permit No. 11020-20000-00240.  The permits described above are sometimes referred to herein as the "Permits."

**Department of Public Works**

15. The Department of Public Works is the City's third largest department responsible for the construction, renovation and operation of City facilities and infrastructure, as well as the delivery of public safety and environmental programs. The Department is composed of the Bureaus of Contract Administration, Engineering, Sanitation, Street Lighting and Street Services.  Within the Bureau of Street Services is the City's Urban Forestry Division.  The Department is headed by the Board of Public Works, a five-member executive team that administrates the Department.

16. Kevin James is the current President of the Board and presides over Board hearings.  His appointment by the Mayor was affirmed by the City Council on

PRINTED ON
RECYCLED PAPER
67376176v1

July 30, 2013.  Plaintiff is informed and believes and on that basis alleges that President James is also responsible for overseeing the Bureau of Street Services and, by consequence, the Urban Forestry Division.

**Tree Removal Ordinance**

17.    The City of Los Angeles regulates the removal and relocation of "protected trees" pursuant to Los Angeles Municipal Code ("LAMC") § 46.00, *et seq.* A "protected tree" is defined by Section 46.01 as any Oak, Southern California Black Walnut, Western Sycamore or California Bay tree measuring 4 inches or more in cumulative diameter, four and one half feet above the ground level at the base of the tree.

18.    Under LAMC §§ 46.00 and 46.02, no protected tree may be relocated or removed unless pursuant to a permit from the City's Board of Public Works or its designated officer or employee.  A permit may be issued if the Board determines that the removal of the protected tree will not result in an "undesirable, irreversible soil erosion through diversion or increased flow of surface waters, which cannot be mitigated to the satisfaction of the City" and the Board finds:

(a)    It is necessary to remove the protected tree because its continued existence at the location prevents the reasonable development of the subject property; or

(b)    The protected tree shows a substantial decline from a condition of normal health and vigor, and restoration, through appropriate and economically reasonable preservation procedures and practices, is not advisable; or

(c)    Because of an existing and irreversible adverse condition of the protected tree, the tree is in danger of falling, notwithstanding the tree having been designated an Historical Monument or as part of an Historic Preservation Overlay Zone.

19.    LAMC § 46.03 authorizes the Board to impose conditions upon the issuance of a permit, including conditions requiring the planting of replacement trees.

JMBM  Jeffer Mangels Butler & Mitchell LLP

20.    LAMC § 46.06, colloquially known as the "Scorched Earth Ordinance," sets forth certain stringent punishments which may be imposed by the City following quasi-judicial administrative hearings, "with respect to any property on which any protected tree has been removed or relocated in violation of Section 46.00" of the LAMC.

21.    Specifically, Section 46.06(a) provides that the Bureau of Street Services (the "Bureau") "shall have the authority to request the Superintendent of Building to withhold issuance of building permits . . . for a period of time up to a maximum of ten years as requested by the Bureau and to revoke any building permit issued for which construction has not commenced. . . . "

22.    Prior to application of the Scorched Earth Ordinance ("Ordinance"), the Bureau must notify the property owner in writing of its intent to act under the Ordinance and provide the property owner a hearing and an opportunity to submit written evidence.

23.    In the event the Bureau finds, as part of the required hearing, that a protected tree was removed or relocated in violation of Section 46.00, Section 46.06(c) provides that the Bureau, "shall specify to the Superintendent of Building the length of time the issuance of building permits shall be withheld and whether building permits for which construction has not commenced shall be revoked." Section 46.06(c) further provides that, in making its determination, "the Bureau shall consider the following factors: the number of trees removed or relocated, the size and age of the trees removed or relocated, the knowledge and intent of the owners of the property with respect to the removal or relocation and prior violations of law with respect to removal or relocation of protected trees."

24.    Section 46.06(d) provides that the property owner may appeal the decision of the Bureau to the Board of Public Works.  Pursuant to Section 46.06(e), "[a]ny final determination of the Bureau or the Board of Public Works on appeal, to request the Superintendent of Building to withhold issuance of building permits or to

PRINTED ON
RECYCLED PAPER
67376176v1

revoke a building permit, shall be forwarded to the Superintendent within ten days of the Bureau or Board's determination and shall also be set forth in an affidavit, which shall be recorded by the Bureau with the County Recorder within ten days of the Bureau or Board's determination."

**The Tree Permit**

25.    As part of the Project, Plaintiff applied for and obtained a tree permit pursuant to LAMC § 46.00 *et seq*.

26.    In 2008, prior to Plaintiff's purchase of the Properties, the City performed environmental review of the planned development of the Properties by Plaintiffs' predecessor under the California Environmental Quality Act ("CEQA"). The City prepared a mitigated negative declaration ("MND") to document its conclusions, finding that the development would not entail environmental impacts that could not be mitigated to insignificant levels.

27.    As part of the environmental review process, the property owner at the time, submitted a detailed tree report prepared by Trees, etc., a division of RDI & Associates, Inc.  The tree report inventoried 105 protected trees on the Properties and 18 protected trees immediately adjacent to the site.  The report recommended removal of 51 on-site trees and 0 off-site trees and a replacement program involving 76 new plantings.

28.    The City's Urban Forestry Division ("UFD"), a division of the Bureau, reviewed the tree report and concurred with its assessment.  In a memo issued by Ron Lorenzen, at the time the City's Assistant Chief Forester, to the City's Environmental Review Unit, Lorenzen wrote, "[t]he Bureau concurs with the tree report's protected tree removals" noting the removals were necessary "to allow for reasonable development of the site."

29.    After a number of years during which time the Project was stalled, and following Plaintiff's acquisition of the Properties, in 2012, Plaintiff's arboricultural consultant, Robert W. Wallace, owner of Tree Life Concern, Inc., conducted a new

JMBM | Jeffer Mangels Butler & Mitchell LLP

tree inventory of the Properties and prepared a new protected tree report ("PTR"). The 2012 PTR identified 117 protected trees on the Properties measuring 4 inches in diameter or larger. Mr. Wallace tagged the trees according to the report during his July 2012 site visits. The PTR determined that 56 protected trees would be severely impacted by the proposed Project and recommended they be removed.

30. A Bureau arborist inspected the Properties on October 25, 2012, and concurred with the Wallace PTR's tree assessment and recommendation determining that the "subject trees require removal due [to] the varying topography and extensive grading subsequently required to allow for the project's construction." The Bureau's report to the Board stated that, "to allow reasonable property development, the Bureau recommends the Board approve the request for a fee tree removal permit." The report bears the initials "RL". Plaintiff is informed and believes and on that basis alleges that "RL" is a reference to Lorenzen.

31. The Board of Public Works subsequently adopted the Bureau report by unanimous vote at a public hearing on February 1, 2013.

32. Consistent with the Board approval, the Bureau issued a tree permit, Permit No. 162657, to Plaintiff allowing the removal of 56 protected trees, including 51 Coast Live Oak, 3 Southern California Walnut, 1 California Sycamore and 1 California Bay Laurel." As a condition of approval, the permit required Plaintiff to "plant one hundred forty (140) one-gallon size, forty (40) 15-gallon size, and thirty-two (32) 24-inch box size Coast Live Oak [] trees; eight (8) 24-inch box size California Sycamore [] trees; and four (4) 24-inch box size California Bay Laurel [] trees on the private property of the above location to replace the removed trees."

33. The permitting process described above makes two things abundantly plain. One, Plaintiff followed the letter of LAMC § 46.00, *et seq.* to obtain the tree permit, including preparing a detailed tree report, the accuracy of which was verified by the Bureau's inspectors and, to Plaintiff's knowledge, has never been questioned. Second, and more importantly, the approvals make it plain that had Plaintiff wanted to

PRINTED ON

RECYCLED PAPER
67376176v1

remove any of the three trees that were subsequently removed by accident, it could have easily applied for and received permits for their removal. Plaintiff, however, did not do so because the design plans created for the construction of the Project did not require removal of the trees that were accidentally removed. Thus, there was no reason to intentionally remove any trees not permitted for removal, for any reason.

### Accidental Removal of Trees 5, 29 and 30

34.    Subsequently, Plaintiff hired Ricardo Gonzalez and his employees to remove trees on the Properties according to the tree permit. Prior to any tree removal, Plaintiff's representative toured the site with Mr. Gonzalez to introduce the Project and the planned tree removals. After reviewing the site and proposed tree removal work, Mr. Gonzalez examined and made certain that Plaintiff had a valid permit to do the work. Mr. Gonzalez advised Plaintiff that, based upon his inspection, he was confident that he and his crew could handle the job.

35.    A few days before the trees were scheduled to be removed, Mr. Gonzalez toured the Property again with an assistant to locate and identify the trees subject to removal. Gonzalez identified the trees by surveying the tags previously placed on each tree by the arborist, and then calling out the listed number to his assistant to cross reference with the tree permit list. Based on the response of his assistant, Gonzalez marked each tree listed to be removed by placing pink tape around the tree.

36.    On September 29, 2014, Gonzalez and his employees proceeded to remove those trees marked with a pink ribbon. After removing each tree, Gonzalez hammered a wooden stake into the ground next to each stump, and attached the corresponding tape and tree tag to the stake to record that the removed tree had been tagged.

37.    On-site supervisor Nathan Ahdoot, inspected the Gonzalez crew's work during the day to confirm that only properly-identified trees were removed. Although it was not known at the time, Gonzalez had incorrectly removed three trees that were

PRINTED ON

RECYCLED PAPER
67376176v1

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1   not permitted for removal—trees identified as tree numbers 5, 29 and 30 on the tree

2   permit.  In addition, four trees that had been permitted for removal had not been

3   removed.  Among the trees that were not removed was tree number 6, in close

4   proximity to tree number 5.  Gonzalez' errors went unnoticed.

5       38.    The next day, on September 30, 2014, Scott Harmon of the City's Urban

6   Forestry Division met with the property owner and the contractor at the Properties.

7   He too did not notice the Gonzalez errors.  In an email to several City officials, he

8   later stated, "Today I met with the owner and contractor at location and confirmed

9   that they have the Protected Tree Removal Permit on site.  We also reviewed the

10  planned removals, mitigation replacements and walked the site . . . .  I met with

11  Norman Kulla from CD 11 also at the site and informed him that the Board approved

12  permit was valid . . . ."

13      39.    Neighbors opposed to the Project who had witnessed or heard about the

14  tree removal were incensed that the tree permit had been issued without notice to

15  them.  Plaintiff is informed and believes and on that basis alleges that the neighbors

16  contacted lawyers, City officials and the media making myriad complaints.  Despite

17  the flurry of activity, fifteen months would pass before anybody would even suggest

18  to Plaintiff that an error had occurred.  That indication first came to Plaintiff when it

19  received a Notice of Administrative Hearing issued by the Bureau on December 20,

20  2015, indicating that tree numbers 5, 29 and 30 had been removed without a permit

21  and that the Bureau "inten[ded] to act" pursuant to the Scorched Earth Ordinance.

22      40.    Plaintiff then hired Mr. Wallace to return to the Project site to investigate

23  the allegations in the Bureau notice.  Wallace and Ahdoot walked the Project site on

24  foot on January 8, 2016, and Wallace walked the site again during the following week.

25  Based on his site visits, Wallace confirmed that tree numbers 5, 29, and 30 had been

26  removed.  Wallace also noted that removed trees had been visibly marked with stakes,

27  which were still there 15 months later, according to normal procedures, indicating that

28  no attempt was made to hide the removals of the three trees.

JMBM  Jeffer Mangels Butler & Mitchell LLP

41.    Mr. Wallace also noted that 4 trees that had been approved for removal were inadvertently not removed, meaning that the total number of trees removed was 55, and not 56 as was permitted by the Tree Removal Permit.

**Initial Attention Focuses on the Board's Approval of the Tree Permit**

42.    The tree removal process sparked a flurry of activity by Project opponents.  On the night of September 29, 2014, the day the removals took place, Sam Rubin, an entertainment reporter for the KTLA Morning News, sent an email to Los Angeles City Councilman Mike Bonin stating, "I am contacting you along with several of my neighbors about what we believe is non-permitted activity involving the cutting down of several very old and very beautiful sycamore trees.  My family and I live at 1755 Old Ranch Road . . . .  This activity is taking place at 1834 Old Ranch Road . . . .  We have serious concerns that there was either no permitting or improper permitting."

43.    Within minutes, Councilman Bonin forwarded Rubin's message to Nazario Sauceda, the Director of the Bureau of Street Services stating, "Nazario – Can you see below from Sam Rubin at KTLA and let us know what is up?"  Based upon responses received, Bonin's e-mail was apparently copied to a wide net of City officials.

44.    Sauceda responded to Bonin at 4:55 a.m. the next day.  Sauceda informed the Councilman that "we will inspect the location this morning and we will review our records to determine the type of permits that were granted to this developer.  As soon as we have some relevant info, we will share it with you."

45.    Later that morning, September 30, 2014 at 9:11 a.m., Greg Good, Director of Infrastructure for the Office of the Mayor, responded to Bonin's e-mail stating, "Any update on this, Nazario?  Is this permitted?  [Board of Public Works President] Kevin [James]… do you know if y'all issued permits on this?"

46.    Kevin James responded, "Greg, According to the latest information… a tree removal permit was granted for this address [in] 2013, by our predecessors.  The

PRINTED ON

RECYCLED PAPER
67376176v1

permit was granted before we took office . . . .  This one did not sound familiar to me (which is explained by the fact that it apparently came before the prior Board of Public Works).  George Gonzales has a staff member either at the site, or on the way to the site, to insure that the parameters of the permit are being met.  I will let you know when I have a further update. Kevin."  Immediately thereafter, at 9:44 p.m., President James added in an email to Good, "Greg, This circumstance also begs the question of extensions of permits and how long they are valid for, etc., which I will discuss with the Bureau."

47.    Plaintiff is informed and believes and on that basis alleges that the subsequent City inspection did not uncover Gonzalez' error.

48.    The fallout from tree removal was enormous.  The story was reported in the local media.   Political pressure from the wealthy and politically-connected neighborhood opposition group mounted.  Plaintiff is informed and believes and on that basis alleges that, as a result of that political pressure, sometime in late September or early October, California Regional Water Quality Control Board employee Vallerie Carillo visited the Properties for an unscheduled site visit.  As a result of the visit, Ms. Carillo determined that Plaintiff was required to perform a revised "jurisdictional delineation" before further work may proceed.  Ms. Carillo also raised various issues relating to Property ownership, CEQA consistency, and the Project's impacts to waterways.  In response to Ms. Carillo's visit, the Project and construction activities were put on hold as Plaintiff was forced to prepare a revised jurisdictional delineation, prepare a CEQA addendum, obtain a revised Streambed Alteration Agreement, and apply for an amendment to the section 401 Water Quality Certification.

49.    On October 7, 2014, again, on information and belief, and as part of the political pressures brought to bear, Plaintiff received a "Notice of Violation: Clean Water Act Section 401 Water Quality Certification . . . ."  The Notice stated that "Regional Board staff observed a front loader and a saw for vegetation clearing on the

PRINTED ON
RECYCLED PAPER
67376176v1

project site and also noted that some ground excavation had commenced with an excavator. Although the front loader was not operating while the site inspection was conducted, the cleared vegetation was evidence that construction activities had commenced." The letter then specified several alleged Clean Water Act violations, and stated that Plaintiff is "now subject to the imposition of civil liability penalties by the Regional Board of up to $10,000 per day in which the violation occurs . . . ."

50. On October 16, 2014, Plaintiff received a letter from the California Department of Fish and Game, stating that Plaintiff's Notification of Lake or Streambed Alteration "is incomplete," and that Plaintiff "may not proceed with [its] project until [the] Notification is deemed complete."

51. The actions of the California Regional Water Quality Control Board and the California Department of Fish and Game effectively put the Project on hold.

52. Much of the initial reaction to the tree removal by the City's political leaders involved their frustration and anger over the Board of Public Work's procedures, which allowed for issuance of the tree permit without notice to the neighborhood Project opponents. On October 17, 2014, Norman Kulla, Senior Counsel for Councilman Mike Bonin, emailed Matt Szabo, the Board of Public Works Commissioner Pro Tem at the time, stating that "Chad and I have been working to address community concerns raised by a project at 1834-1838 Old Ranch Road. Among the many components of this project was the Board's approving removal of 56 protected trees . . . . The removal was a big deal . . . . When trees started being removed the neighbors and neighborhood became enraged. Of course that's when Mike was contacted and we engaged. Can we meet and confer to consider how notice procedures might be altered to provide for stakeholder notification when there is a significant impact to the character of a neighborhood?"

53. Shortly thereafter, Councilman Bonin's Chief of Staff, Chad Molnar, responded stating that "the boss wants to do a motion to require public notification before issuing permits to remove protected trees on private property. We would like

JMBM Jeffer Mangels Butler & Mitchell LLP

to discuss with you . . . ."

54.    Commissioner Pro Tem Szabo responded stating "OK thanks. Looping in Kevin [James] as he oversees Street Services . . . please set up a meeting with everyone on this email that works for Kevin's schedule."

**The Project Opponents, City Politicians and Administrative and Enforcement Personnel Turn Their Sights on Plaintiff**

55.    Naturally, the anger of the Project opponents and City officials was not limited to the Department of Public Works for issuing the tree permit.  Quickly, attention turned to Plaintiff as the Project opponents and City politicians and regulators sought to find a way to leverage the tree removal as a method to prevent the development of the Properties.

56.    On January 23, 2015, Project opponent, Sullivan Canyon Property Owners Association, Inc. filed an appeal of Plaintiff's building permits with the Los Angeles Department of Building and Safety.

57.    On February 19, 2015, outspoken Project opponent, Project neighbor, and former State Senator Tom Hayden submitted a letter to his "Dear Friends" Councilman Mike Bonin, Mayor Eric Garcetti, and the City Attorney, restating his opposition to the Project, and questioning the political contribution activities of Plaintiff and its members, going so far as to make outrageous allegations that Plaintiff supposedly "offered bribes" to Regional Water Quality Control Board staff.  Plaintiff is informed and believes that this was just one of several letters prepared and sent by former State Senator Hayden.

58.    On June 15, 2015, famous television and movie actor Ed. O'Neill also wrote to Councilman Bonin's Chief of Staff, Chad Molnar, in opposition to the Project and the tree removal.

59.    On June 16, 2015, Ted Bardacke, Director of Infrastructure for the Office of the Mayor emailed the now Assistant Director of Street Services Ron Lorenzen, with a copy to Board President James.  The subject of the email was

PRINTED ON
RECYCLED PAPER
67376176v1

- 15 -

"Appeal for Environmental oversight – 1834 to 1838 Old Ranch Road []".  The email continued, "Hi Ron: Great meeting with you today.  I came away very excited.  Heritage Tree removal/CEQA issue?  Can you take a look?  Thanks."

60.    The clear indication from the Bardacke e-mail was that Bardacke and Lorenzen were strategizing to come up with some way to come after Plaintiff and the Project.  Bardacke was "very excited" at the possibilities apparently suggested by Lorenzen.  For his part, Lorenzen had come a long way.  Although he had twice recommended the removal of the trees, and without yet learning of the Gonzalez error, Lorenzen now, apparently succumbing to the pressure from the Project opponents and City politicians, was investigating ways to block the Project.

61.    On June 16, 2015, Daniel Tamm of the Mayor's Office of Public Engagement, responded to an email from a Project opponent, copying Councilman Bonin, Molnar, and Nora Dresser, a Project Planner for the City of Los Angeles' Office of Zoning Administration.  Tamm's email thanked the opponent for his comments.  "I am logging them," said Tamm.  "While the Mayor's office can't guarantee you an outcome, the Mayor fully supports Councilmember Bonin in this, who has primary responsibility for land use matters in the district."

62.    United States Congressman for the 33rd District, Ted W. Lieu sent a letter to Dresser on July 28, 2015.  In it, Congressman Lieu stated, "I am writing in opposition to the Sullivan Canyon project that is currently pending before the City of Los Angeles Office of Zoning Administration.  With the removal of 58 protected old-growth trees, this project has already caused irreparable damage to an environmentally sensitive area, with the potential to cause more harm if left unchecked."

63.    Los Angeles County Supervisor Sheila Kuehl sent an email through a staff member on July 29, 2015, to multiple members of the City of Los Angeles Mayor's Office as well as Councilman Bonin's office, stating that "Sup. Kuehl wanted me to convey to you that she is extremely concerned about this project . . . .  She

PRINTED ON

RECYCLED PAPER
67376176v1

couldn't feel more strongly that this project has already caused serious environmental damage and should be stopped. If you have any questions, please do not hesitate to ask. She is aware that CM Bonin is 'on the case' and that the Mayor's Office is well aware of the situation. If there is anything you think she can be helpful with, please let us know . . . ."

64.    Molnar responded to the email, "Yep, we are certainly on it. We agree that it is an awful, terrible project and will do everything we can to stop it . . . ."

65.    Rick Jacobs, Executive Vice Mayor and Deputy Chief of Staff for Los Angeles Mayor Eric Garcetti, responded, "Thanks, Torie. Ana is aware and working internally on this. Rick. "  Plaintiff is informed and believes and on that basis alleges that "Ana" refers to Ana Guerrero, Chief of Staff for Los Angeles Mayor Eric Garcetti.

66.    On October 8, 2015, Paul Gomez, Public Relations Specialist for the City of Los Angeles Department of Public Works sent an email to Sauceda, Lorenzen, and Joseph Cruz, all Bureau executives. The email, copied to President James and several others, stated, "we received a call from Jack Schwada from City Watch. He would like to get reports and speak to a representative from Street Services on a development project that is going on at [the Properties]. According to the reporter, 60 trees were cut down without proper notification back in November 2014. He would like to know if any supervisors or arborists are present when trees are being cut down and has general questions on tree removals . . . ."

67.    President James—who had apparently previously communicated with either Schwada or, more likely, Gideon Kracov the attorney representing the Project opposition group—and who was apparently also concerned with how the Department would be depicted by Schwada, sent an email to Good on October 9 stating, "Gideon sent Schwada an email correcting him on the chronology of the tree removal permit and let him know this admin has been helpful and cooperative etc."

68.    Later that day, President James, again concerned with how Schwada

PRINTED ON

RECYCLED PAPER
67376176v1

- 17 -

might portray the Department in the press, sent Lorenzen an email copying dozens of other City of Los Angeles staff and officials, stating, "Ron – (because the angle of his last question seems to be leaning towards inaction on the part of the board of public works) it might also be worth noting that we are, and have been in, the process of a complete CEQA policy review. . . ."  In another email to Lorenzen, James emphasized "Ron, I want it made clear in our response to John Schwada that the tree removal permit granted for these trees was granted in February 2014 – by the prior Board of Public Works, under the prior administration.  This development project has never come before the Board of Public Works appointed by Mayor Garcetti."  Lorenzen responded, "Commissioner[,] That will be emphatically stated."

69.    On the same day, under the same email thread, James wrote to Good, stating, "As you will recall the tree removal permits for this project was granted by the prior board of public works under the prior administration.  When we inquired if there was anything we could do, we were told by the city attorney's office that there was nothing we could do beyond the inspection post-removal to make sure they only took the trees covered in the permit."

**Discovery of the Gonzalez Errors**

70.    On September 22, 2015, Gideon Kracov sent an email to President James demanding that Public Works perform another site inspection of the Property.  James was quick to act in response to the Kracov email.

71.    President James forwarded the email to Lorenzen the next day stating, "Let's discuss – ."  Lorenzen quickly responded, "Just let me know when."  Later that day, President James responded, "Please schedule a conference call for myself and Mr. Lorenzen for Friday if possible. Thanks, Kevin."  Plaintiff is informed and believes and on that basis alleges that a teleconference was scheduled, and did occur, between President James and Lorenzen on Friday, September 25, 2015, to discuss Kracov's demand and strategize over how to proceed.

72.    By December 3, 2015, the planned inspection still had not occurred.

JMBM
Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
67376176v1

President James sent an email to Lorenzen requesting an update on the pending inspection. Lorenzen responded to President James on December 5, 2015, promising that inspections will occur on Monday, December 7, and that he will "let all know."

73.    On December 4, 2015, Kracov emailed James and Lorenzen, with a copy to a Project opponent stating, "Ron: Here is the map we have, and the permit. Clients want to be sure the trees removed match up with the 56 that were permitted. In particular, was more than one sycamore removed? Permit said just one. Thank you."

74.    On December 5, 2015, Lorenzen responded to Project opponent and neighbor Sara Nichols, with a copy to Kracov and James, reporting "Will inspect on Monday and let all know[.] Ron." Plaintiff is informed and believes and on that basis alleges that Lorenzen inspected the Properties on Monday December 7, 2015, with the information supplied by Kracov, and discovered the Gonzalez errors.

75.    Lorenzen immediately reported his findings to President James. In a December 8 mail to James, Lorenzen reported: "Morning Commissioner: The results of the inspection were as follows: 177 Protected trees in the report – 56 Protected trees permitted for removal (BPW approval, not the original CEQA doc) – 55 of the 56 permitted trees are removed – Tree #6 permitted but remains Coast Live Oak – Trees #29 and 30 were removed without permit – tree #5 Ca Sycamore removed without permit."

76.    Lorenzen, who had apparently already consulted with the City Attorney, laid out for President James the Department's options. "Options: 1. Require extreme replacement for the three unpermitted removals (ie full inch/inch replace) 2. Communicate with CA office and file a criminal charge regarding the three unpermitted removals. In past convos with CA office, they opine a max fine of $1000/illegal removal. 3. Invoke LAMC Sec 46.06 and void all existing permits and not issue any permits for a period of up to ten years. I will be happy to communicate with GK (but not discuss options for now). Let me know if you would like to discuss."

JMBM | Jeffer Mangels Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
67376176v1

77.    Plaintiff is informed and believes and on that basis alleges that the initials "GK" refer to Gideon Kracov, the attorney representing the Project opponents.

78.    Within an hour, President James responded back to Lorenzen:  "Let's discuss this today, before you speak to Gideon.  Thank you for having this done." President James then forwarded the email to Greg Good, Director of Operations of City Services for the Office of the Mayor.

79.    On December 9, 2015, Mayor's office official Good emailed President James, apparently referencing the discovery of the Gonzalez errors stating, "Again, this is amazing – and you have several options.  What are you thinking at this point?"

80.    The next day, on December 10, 2015, Molnar from Bonin's office sent an email to. Lorenzen, subject "Non-permitted Protected Tree removal 1834 & 1838 Old Ranch Road" and stating, ". . . Councilmember Bonin has been worried about this project for some time, and particularly worried that the owners were removing protected trees without a permit.  Could you give me a call when you get a chance to discuss?  We're interested in knowing if it is true that the inspector found unpermitted protected tree removals, and if so then what the enforcement action will be? My cell phone number is. . . .  Thanks."  Lorenzen responded the same day, "Hi Chad [] I tried calling and left a vm.  I can be reached at []. I look forward to discussing."

81.    Molnar responded the next day:  "Hi Ron, Thanks for the call yesterday, it was very helpful.  **I wanted to give you a heads up that I briefed CM Bonin, and he believes strongly that at this point we need to revoke all permits for the project, given the violation.  We can discuss more once you've had a chance to meet with your team, but I wanted to make sure to let you know what the CM wants to do.**  Thanks again." [emphasis added]

82.    Lorenzen replied, "Hi Chad **Understood.  I am in agreement** [] Will keep you abreast"  [emphasis added] The implication from Lorenzen was plain.  By December 11, 2015, he was "in agreement" with the Councilman that the Permits should be revoked.

PRINTED ON

RECYCLED PAPER
67376176v1

83.    Molnar pressed the issued again on December 15, 2015.  In an email to President James he stated, "**Councilmember Bonin feels strongly that we need to quickly move ahead with revoking those permits.  We've been in touch with Ron Lorenzen, and he is working through the process with the City Attorney**." [emphasis added] Molnar continued, "**Mike mentioned that you wanted to help with this as well, so he wanted to make sure I gave you the heads up on what's happening.  It is our hope that we can quickly move forward with revoking the permits, before the applicant causes any more damage**."  [emphasis added]

84.    Thus, if it was not already clear enough by James' active involvement in and supervision over the investigation into the tree removal, Molnar, through his report of a conversation that had taken place between Councilmember Bonin and President James, made plain that President James had committed to ensure that Plaintiff's Permits would be revoked.  This was despite the fact that none of the required hearings necessary to invoke the Scorched Earth Ordinance had occurred, that nobody from the City had even spoken with Plaintiff to understand its version of the events leading to the tree removal, and that James, as Board President, knew that he would ultimately be presiding over a quasi-judicial hearing in which he would act as a judge over the matter.

85.    Later that day, Debbie Dyner Harris, District Director for Councilmember Mike Bonin, sent an email to Molnar and Councilman Bonin's Planning Deputy Tricia Keane, with the subject, "1838 Old Ranch Rd."  The email stated, "I got a call from Greg Spotts, Assistant Director at [Bureau of Street Services], regarding these trees.  He called to find out what our office's goal is regarding this property.  He was told that our office wants to implement the scorched earth policy to prevent the builder from building on the site for 10 years.  I can't find out if that is true from the planning report- he asked whichever one of you is best to give him a call to figure out what the best course of action here is: []."

86.    Molnar quickly responded to Harris:  "Yes, that is true. Mike feels

PRINTED ON

RECYCLED PAPER
67376176v1

- 21 -

1    strongly that we need to revoke all building and construction permits, and ban new

2    permits for ten years. I will call him."

3        87.    As alleged above, the Bureau notice indicating its intent to invoke the

4    Scorched Earth Ordinance was delivered to Plaintiff shortly thereafter, December 20,

5    2015.

6        **The Sham City Hearings**

7        88.    A hearing was subsequently scheduled to take place before the Bureau

8    on February 12, 2016.  On February 10, 2016, Plaintiff's attorney submitted a letter to

9    the Board of Public Works in advance of the February 12 hearing.  In the letter,

10   Plaintiff explained that (i) the trees at issue had been removed due to an unintentional

11   error; (ii) Plaintiff was unaware of the improper removal prior to the Bureau notice

12   and has never improperly removed protected trees on any previous occasion; and (iii)

13   the circumstances in this matter do not warrant the application of a "Scorched Earth"

14   penalty.  The letter also volunteered additional mitigation and replacement measures

15   beyond those already provided for in the tree permit, including the planting of

16   additional mature replacement trees "of substantial size and age (e.g. 10-20 years) in

17   recognition of the size and age of the removed trees."

18       89.    Plaintiff also submitted sworn declarations from the Project arborist, the

19   Property owners, and the site supervisor stating that the removal occurred

20   unintentionally.  The declarations also established that Plaintiff had no reason to

21   intentionally remove the misidentified trees since they did not block access and did

22   not impede or interfere with the plans to develop the Property such that there was no

23   benefit to be gained from removing the misidentified trees.

24       90.    The day before the hearing, Molnar wrote to a Project opponent that had

25   inquired about the upcoming hearing:  "I personally sat down with Urban Forestry to

26   discuss this hearing . . . and they are fully aware of CM Bonin's expectation that the

27   department will hold the applicant accountable for the removal of the protected trees.

28   The next step in the process, after this hearing, will be a hearing before the Board of

JMBM | Jeffer Mangels Butler & Mitchell LLP

1    Public Works, and at that point we expect that the Councilmember will attend
2    himself."

3    91.    The hearing took place on February 12, 2016, before the Bureau of
4    Street Services. ***Incredibly, the hearing officer was none other than Ron Lorenzen***
5    ***himself***—the individual that had recommended the issuance of the permits and had
6    been publicly scrutinized for it, the individual who had acted as the City's lead
7    investigator into the matter and who had schemed with a representative of the
8    Mayor's office in June concerning ways to come after Plaintiff and Plaintiff's Project
9    and who had announced two months prior that he was "in agreement" that the Permits
10    should be revoked.    That Lorenzen was charged by the City with conducting a
11    supposedly quasi-judicial fact finding hearing into the matter and would be rendering
12    the initial determination as to whether the City should and would invoke the Scorched
13    Earth Ordinance made plain that the hearing was a sham and the result of the hearing
14    was preordained.

15    92.    During the hearing, Plaintiff's arboricultural consultant Robert Wallace
16    testified that the removal of the trees "was likely an inadvertent mistake" based on
17    numerous factors he personally observed, such as the number and location of trees
18    permitted to be removed.    Plaintiff reiterated that the inadvertent removal did not aid
19    the Project as designed in any way, and that all trees that were needed to be removed
20    were included on the original tree permit.    Plaintiff's tree removal contractor, Mr.
21    Gonzalez, also attended and testified that the removal of any unpermitted trees was
22    inadvertent and accidental, and that at all times he was attempting to comply with the
23    terms of the tree permit.    Plaintiff further noted that, although an error may have been
24    made, ultimately the removal activity involved 55 trees whereas the tree permit
25    allowed for the removal of 56.    Finally, Plaintiff proposed additional mitigation.

26    93.    On March 14, 2016, the Bureau issued its determination.    To nobody's
27    surprise, the Bureau recommended that the Scorched Earth Ordinance be invoked and
28    that the Department of Building and Safety revoke all existing building permits,

PRINTED ON
RECYCLED PAPER
67376176v1

suspend existing building permits and suspend issuance of any new building permits on the Properties for five years (the "Bureau Determination").

94.    It was also improper for the Bureau to recommend revocation of Plaintiff's grading permits since the Ordinance applies only to building permits.  Of course, such legal niceties were of no concern to the Bureau or the City in general as their goal all along was to kill the Project and punish Plaintiff.

95.    The Bureau Determination's primary findings were that (i) 3 of the 117 protected trees on the Properties were removed improperly; (ii) Plaintiff "had implemented a comprehensive process to ensure that only those trees permitted to be removed would in reality be removed"; and, (iii) because trees were improperly removed in spite of these measures, that this establishes Plaintiff's intent to willfully remove the protected trees at issue.

96.    The reasoning was obviously illogical as it turned the fact that Plaintiff had operated within the confines of the law and had tried to be careful to hew closely to the terms of the permit against Plaintiff by using an error that occurred in spite of these efforts as the chief reason to invoke the most drastic remedy available to the City.

97.    The Bureau also determined that it would request the Department of Building and Safety to "revoke any existing building permits and withhold the issuance of future building permits on both properties for a period of five (5) years." It further found, without explaining the basis for this finding, that "the removal of the three unpermitted trees . . . were not removed by accident but intentionally to provide better access to the property or in some other fashion enable easier development." That finding in particular cannot be sustained because all of the evidence before Lorenzen was to the contrary, including several sworn affidavits submitted by Plaintiff and its employees.

98.    That the Bureau recommended a 5-year moratorium instead of the 10-year maximum penalty bears little significance.  Lorenzen surely knew that the

PRINTED ON
RECYCLED PAPER
67376176v1

1    Project had been permitted under the City's standards prior to the enactment of the

2    City's new hillside ordinance and that revoking the Permits meant that any

3    development of the Properties in the future would have to occur under the new laws,

4    which would not permit the design and size of the homes planned by Plaintiff.  In

5    other words, the revocation and suspension for any length of time would kill the

6    planned Project.

7        99.    On April 12, 2016, Plaintiff timely appealed the Bureau Determination

8    to the Board of Public Works.  A hearing was scheduled for June 24, 2016.

9        100.   On June 16, 2016, Lorenzen sent an email to James with a document

10   attachment that apparently included a draft and unsigned copy of the staff report on

11   the appeal to be provided to the Board of Public Works.  In the body of the email

12   Lorenzen states to James "I wrote this as simply and straightforward as possible."

13       101.   As alleged above, the President of the Board of Public Works is Kevin

14   James who would preside over the appeal hearing.  As also alleged above, President

15   James supervised Lorenzen's investigation, was actively involved and was personally

16   embroiled in the investigation and controversy, was politically motivated to clear the

17   name of the Department that had issued the tree permit in the first place and,

18   according to Molnar, had also, like Lorenzen, announced that he was in favor of

19   ensuring that the Permits were revoked.  President James was biased against Plaintiff,

20   the Properties and the Project and had pre-committed to ensure that the appeal was

21   denied.

22       102.   In advance of the hearing, a staff report was prepared by Lorenzen

23   recommending that the Board "deny the appeal of the Bureau's recommendation to

24   the DBS to revoke any existing building permits an withhold the issuance of any

25   building permits for a period of 5 years for the parcels located at 1834 and 1838 Old

26   Ranch Road."  The staff report further contended that Plaintiff "willfully directed the

27   contractor to remove the subject trees or through the negligence of [Plaintiff's]

28   contractor the subject trees were removed."  Such a loose statement was emblematic

JMBM | Jeffer Mangels Butler & Mitchell LLP

1   of the process to which Plaintiff was being subjected.  There was absolutely no

2   evidence before Lorenzen that the tree removal was intentional or that Plaintiff

3   "willfully directed" Gonzalez to remove the subject trees.  But more to the point, the

4   two scenarios he posited—either Plaintiff acted intentionally or the contractor acted

5   negligently—were on the opposite ends of the culpability spectrum yet it mattered not

6   to Lorenzen for he had determined that the Permits would be revoked long before.

7       103.  The City's two chief investigators into the matter presided over the two

8   City hearings afforded Plaintiff prior to the deprivation of its Property interests.

9   Lorenzen and James thus acted as investigator, prosecutor, judge, jury, executioner

10  and even appellate judge.  The utter lack of due process could not be more

11  pronounced.

12      104.  On June 24, 2016, the Board of Public Works heard the appeal, and

13  voted to uphold the Bureau Determination.  President James spoke stridently in

14  support of the Bureau Determination, and railed that it would be appropriate to make

15  an example of Plaintiff in order to scare off other would be illegal tree-removers to

16  know that such illegal activity will have serious consequences.  Incredibly, although

17  it is customary and expected that quasi-judicial hearing officers disclose *ex parte*

18  communications had regarding the matter under consideration, President James did

19  not disclose the mountain of *ex parte* communications he had engaged in.  No others,

20  including Department staff, disclosed their *ex parte* communications either.

21  Councilmember Mike Bonin appeared at the hearing and spoke to the Commission

22  urging them to deny the appeal.

23      105.  The motion to deny the appeal was made by none other than President

24  James.  Again to nobody's surprise, the motion passed and the preordained result was

25  achieved.

26      106.  As a result of the sham hearings, all of the Permits were revoked and the

27  City could not issue any new permits for the Properties for five years from the date of

28  the City's determination.  Plaintiff is also informed and believes and on that basis

JMBM | Jefer Mangels Butler & Mitchell LLP

1   alleges that the City has recorded the City's determination against the Properties

2   under the terms of the Scorched Earth Ordinance.

3        **The State Court Litigation**

4        107.   On May 9, 2017, Plaintiff filed against Defendants in the Los Angeles

5   Superior Court a Verified Petition for Writ of Mandate pursuant to California Code of

6   Civil Procedure § 1094.5 seeking to set aside the decision of Defendants to revoke

7   the Permits and retire Plaintiff's Property development rights.   In the petition,

8   Plaintiff reserved its federal claims for adjudication in federal court under *England v.*

9   *Louisiana State Board of Medical Examiners*, 375 U.S. 411 (1964).

10       108.   Trial of the petition took place in the superior court on May 14, 2019.

11  On August 12, 2019, the court issued its ruling on the petition.  The court held that

12  Defendants denied Plaintiff a fair trial.  Accordingly, the court determined that it will

13  enter judgment in favor of Plaintiff and issue a writ of mandate directing Defendants

14  to set aside the administrative decision and sanction.

15

16            **FIRST CAUSE OF ACTION**

17  CIVIL RIGHTS VIOLATIONS, 42 U.S.C. § 1983, DENIAL OF PROCEDURAL

18              AND SUBSTANTIVE DUE PROCESS

19       109.   Plaintiff incorporates by this reference the allegations of all Paragraphs

20  above, as if fully set forth herein.

21       110.   Defendants, acting under color of state law and in violation of 42 U.S.C.

22  § 1983, have deprived Plaintiff of its rights, privileges or immunities secured by the

23  Due Process Clause of the United States Constitution.

24       111.   The Due Process Clause of the Fourteenth Amendment guarantees

25  parties a fair trial before a fair tribunal, whether it be an administrative agency or a

26  court.   A plaintiff establishes a claim of bias violating due process requirements

27  where it shows actual bias on the part of decisionmakers or the "appearance of

28  partiality".  The test of the ability of the administrative body to act is whether in light

of the particular facts experience teaches that the probability of actual bias on the part of the decisionmaker is too high to be constitutionally tolerable.  Thus, due process is violated where the decision maker is actually biased against a party, is personally embroiled in the controversy to be decided or has pre-committed to decide the matter in a particular way.  Likewise, it is a fundamental rule of due process that no employee involved in investigating or prosecuting a case may participate as an adjudicator.  The fair hearing to which a person is entitled must be before an arbiter that has not participated in staff decisions.

112.   Ron Lorenzen and Kevin James were biased against Plaintiff, Plaintiff's Property and the Project.  They had conducted and led the investigation of the matter prior to presiding over the only two quasi-judicial hearings afforded Plaintiff prior to the deprivation of its property rights in the Properties and Permits.  Each had pre-committed to deciding the matter against Plaintiff.  Each was personally embroiled in the controversy.  Their participation in the City hearings rendered the proceedings a sham and the results preordained.

113.   The Scorched Earth Ordinance is unconstitutional on its face and as applied to Plaintiff given the lack of procedural due process.

114.   Plaintiff has substantive due process rights to be free from arbitrary and capricious government conduct.  A deliberate flouting of the law that trammels significant personal or property rights violates substantive due process and is actionable under the Fourteenth Amendment and Section 1983.

115.   The City deliberately flouted the law and trammeled Plaintiff's property rights in the Properties and Permits by failing to provide Plaintiff with a fair hearing before a neutral arbiter, by revoking permits for a property on which no unpermitted protected trees were removed in plain violation of the LAMC, by revoking grading permits also in plain violation of the LAMC and recording documents against the Properties invoking penalties the City was not authorized to impose thereby slandering Plaintiff's title.

116.   As a direct and proximate result of the City's actions, Plaintiff has suffered damages and will continue to suffer damages in an amount to be proven at trial.

117.   In addition, Plaintiff is informed and believes and thereon alleges that unless and until restrained by this Court, the City will continue to refuse to reinstate the Permits and will refuse to issue new permits.

118.   Unless the City is enjoined and restrained from engaging in such conduct, Plaintiff will be irreparably injured and deprived of Constitutional rights guaranteed under the state and federal Constitutions, and will suffer substantial loss of money and profits, the nature and extent of which will be extremely difficult or impossible to ascertain.

119.   Plaintiff has no adequate remedy at law to prevent or redress the irreparable injury alleged herein.

## SECOND CAUSE OF ACTION

CIVIL RIGHTS VIOLATIONS, 42 U.S.C. § 1983, INVERSE CONDEMNATION AND TAKING OF PROPERTY WITHOUT JUST COMPENSATION IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION

120.   Plaintiff incorporates by this reference the allegations of all Paragraphs above, as if fully set forth herein.

121.   The Fifth Amendment of the United States Constitution, made applicable to the State of California under the Fourteenth Amendment, prohibits the taking of private property for public use without just compensation.

122.   Plaintiff has a substantial investment in the Property, the Project and the Permits.

123.   The acts of the City described herein have effectuated a temporary and permanent taking of Plaintiff's property, including the Property, the Project and the

PRINTED ON
RECYCLED PAPER
67376176v1

Permits, without just compensation.

124.    As a result, the actions of Defendants have effectively eliminated Plaintiff's ability to make use of its Property in direct interference with its distinct investment-backed expectations thereby entitling Plaintiff to compensation pursuant to *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978) and *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992).

## **THIRD CAUSE OF ACTION**
### DECLARATORY RELIEF

125.    Plaintiff incorporates by this reference the allegations of all Paragraphs above, as if fully set forth herein.

126.    An actual controversy exists among Plaintiff and the city inasmuch as Plaintiff contends, and the City disputes, that (1) the Scorched Earth Ordinance is unconstitutional in its face and as applied to Plaintiff; (2) Plaintiff was denied a fair hearing; (3) application of the Scorched Earth Ordinance effects a taking of property without the payment of just compensation in violation of the United States and California Constitutions; (4) the revocation of the permits in respect to a non-offending property and the revocation of the grading permits effects a taking of the Properties without the payment of just compensation in violation of the United States and California Constitutions; (5) Plaintiff is entitled to the immediate reinstatement of the Permits; and (6) Plaintiff has vested rights to complete the Project and develop its Property under the terms of the Permits.

127.    Plaintiff desires an immediate declaration of its rights arising out of all of the facts and circumstances alleged herein and the concomitant obligations of the City.  Such declaration is necessary and appropriate at this time inasmuch as Plaintiff is irreparably injured and will continue to suffer irreparable injury until such time as a declaration of their rights is made.

PRINTED ON
RECYCLED PAPER
67376176v1

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

1.    For a judicial declaration and decree that the Scorched Earth Ordinance is facially unconstitutional because it fails to satisfy due process guarantees;

2.    For a judicial declaration and decree that application of the Scorched Earth Ordinance to Plaintiff was unconstitutional because Plaintiff was deprived of procedural and substantive due process, the penalty imposed was excessive and Plaintiff was denied equal protection;

3.    For a preliminary and permanent injunction restraining the City and its agents, employees, representatives, successors, and all persons acting in concert with it from enforcing the unconstitutional Scorched Earth Ordnance and ordering the City to reinstate the Permits;

4.    For a preliminary and permanent injunction ordering the City to immediately reinstate Plaintiff's building permits for the non-offending property and all grading permits;

5.    For a declaration of the rights and duties of the parties as requested herein above;

6.    For compensatory damages in an amount to be determined at trial;

7.    For an award of just compensation as a result of the taking of Plaintiff's property.

8.    For reasonable attorney's fees pursuant to 42 U.S.C § 1988 and any other applicable provision of state or federal law;

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

PRINTED ON

RECYCLED PAPER
67376176v1

1    9.    For exemplary and punitive damages;

2    10.    For costs of suit herein; and

3    11.    For such other and further relief as the Court may deem just and proper.

4

5    DATED:  September 30, 2019    JEFFER MANGELS BUTLER & MITCHELL LLP

6                                                    BENJAMIN M. REZNIK
                                                       MATTHEW D. HINKS
7                                                    SEENA M. SAMIMI
                                                       JULIA CONSOLI-TIENSVOLD

8

9                                                    By:___/s/_____
                                                                    MATTHEW D. HINKS
10                                                  Attorneys for Plaintiff SULLIVAN EQUITY
                                                       PARTNERS. LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as provided in Rule 38 of the Federal Rules of Civil Procedure and Local Rule 38-1.

DATED:  September 30, 2019

JEFFER MANGELS BUTLER & MITCHELL LLP
BENJAMIN M. REZNIK
MATTHEW D. HINKS
SEENA M. SAMIMI
JULIA CONSOLI-TIENSVOLD


By: ___/s/_____
              MATTHEW D. HINKS
Attorneys for Plaintiff SULLIVAN EQUITY
PARTNERS, LLC

PRINTED ON

RECYCLED PAPER
67376176v1